1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10   DAWNA M. MCNEAL,                    )   No. ED CV 04-824 PJW
                                         )
11                    Plaintiff,         )
                                         )
12             v.                        )   MEMORANDUM OPINION AND ORDER
                                         )
13   JO ANNE B. BARNHART,                )
     COMMISSIONER OF THE SOCIAL          )
14   SECURITY ADMINISTRATION,            )
                                         )
15                    Defendant.         )
     _____)

16

17                              I.

18                         INTRODUCTION

19        Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and

20   1383(c)(3), seeking reversal of the decision by Defendant Social

21   Security Administration ("Agency") denying her applications for

22   Disability Insurance Benefits ("DIB") and Supplemental Security Income

23   ("SSI") benefits.  Alternatively, she asks the Court to remand the

24   case to the Agency for further proceedings.  After reviewing the

25   record and for the reasons discussed below, the decision of the Agency

26   is AFFIRMED, and this action is DISMISSED WITH PREJUDICE.

27

28

                                   1

II.

BACKGROUND

Plaintiff was born on August 24, 1956, and was 46 years old at the time of the administrative hearing. (AR 22, 89, 314.) She has a high school education and past relevant work as a sales clerk, scanner, and maintenance worker. (AR 25-31, 132, 135.)

Plaintiff filed protectively for DIB and SSI on August 8, 2000, alleging disability since March 15, 1998.[1] (AR 89-92.) The cause of Plaintiff's alleged disability was arthritis, degenerative joint disease, an ankle fracture, and peripheral neuropathy. (AR 57.) After her claim was denied initially and on reconsideration (*see* AR 59-68), she timely requested a hearing before an administrative law judge ("ALJ"). (AR 69.)

The ALJ held a hearing on January 2, 2003. (AR 22-54.) Plaintiff appeared with counsel and testified. (*See* AR 25-43, 47-48.) Dr. Sami Nafoosi, a medical expert, also testified. (*See* AR 44-47; *see also* AR 74-77.) Finally, the ALJ heard testimony from a vocational expert. (*See* AR 48-51; *see also* AR 78-79.)

Plaintiff first testified about her general work history, which included work as a scanner, custodian, and various stints at running her own house-cleaning company, although she did not do the actual cleaning herself. (*See* AR 25-30.) She continued to work until breaking her ankle and cracking a vertebra in her back in an accident

---

[1] The ALJ noted that Plaintiff had filed a previous application for SSI on April 12, 1999, and that, after a hearing, an ALJ had denied her application on May 15, 2000. (AR 11.) Pursuant to *Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1988), the ALJ observed that Plaintiff had the burden to rebut the presumption of continuing non-disability.

1   on Valentine's Day 2000, which injuries resulted in a three-day
2   hospital stay.  (*See* AR 30-31.)  Plaintiff testified that her income
3   consisted of $300 per month given to her by a friend, as well as
4   approximately $140 in food stamps.  (*See* AR 32-33.)

5       Additionally, Plaintiff testified about her continuing health
6   complaints.  She explained that, even after two surgeries on her ankle
7   in 2000, it was "still not quite right," and added that she suffered
8   numbness on the left side of her body, either because of multiple
9   sclerosis or two strokes she claimed to have suffered a few years
10  earlier.  (*See* AR 31, 33-34, 41.)  Since her accident, Plaintiff had
11  been advised to have a partial hysterectomy, which she refused, and,
12  as a result, had been hospitalized five times for blood transfusions
13  because of dysfunctional uterine bleeding.  (*See* AR 31-32, 42-43.)
14  Further, Plaintiff claimed to have been diagnosed with arthritis in
15  her knees.  (AR 34.)  She stated that her back was in "constant pain"
16  and that her right foot "blows up" constantly.  (*See* AR 35-36.)

17      To manage her pain, Plaintiff stated that she took Vicodin, an
18  oral anti-inflammatory, and iron supplements; she testified, however,
19  that her medications caused side-effects.[2]  (*See* AR 33, 35-37.)  When
20  she could afford it, she also would take Valium, but she stated that
21  she had been unable to afford the drug for months.  (AR 33-34.)  She
22  also stated that she used a TENS unit "constantly" to manage her pain.
23  (AR 34-35.)  Additionally, Plaintiff would soak her foot and "try to
24
25
26

27      [2]  Because both of Plaintiff's substantive claims pertain to her
    alleged side-effects, the particulars of this testimony will be
28  summarized below.

3

walk" to keep her joints from locking up. (AR 36.) Finally, Plaintiff stated that she had just begun attending sessions with a psychiatrist. (AR 37-38.)

Plaintiff admitted that she drove herself to the hearing, but claimed that her night-blindness precluded her from driving at night. (AR 33.) She stated that she used a cane whenever she needed to stand for a long time or walk long distances. (AR 40-41.) Plaintiff estimated that she could stand for 15-20 minutes (or sit from 25-30 minutes) before her discomfort required her to change positions. (AR 36-37.) Additionally, Plaintiff complained that her pain interrupted her concentration. (AR 37.)

The medical expert, Dr. Nafoosi, testified next. (AR 44-47.) He concluded that Plaintiff's medically-determinable impairments included her right ankle injury, uterine bleeding dysfunction, and depression, but added that none of these impairments met or equaled a "Listing." (AR 44.) Dr. Nafoosi's review of Plaintiff's medical chart led him to opine:

> I would limit her ability to work in jobs that require her
> not [*sic*] to lift more than 20 pounds on occasion, 10 pounds
> frequently. She could sit for eight hours of an eight-hour
> day, stand or walk for six hours in an eight-hour day. Now,
> she should not stand or walk for more than one hour at a
> time before she changes position. She [...] could
> occasionally work on uneven surfaces and occasionally climb
> stairs and occasionally perform jobs that required her to
> balance and occasionally use her right lower extremity for
> foot controls.

4

(AR 45.)  Dr. Nafoosi recognized that Plaintiff's condition could cause pain and that her depression could intensify the experience of that pain, but noted that the record was insufficient to permit him to opine as to the severity of her pain.  (AR 46-47.)

Finally, the ALJ heard testimony from the vocational expert.  She described Plaintiff's past relevant jobs as house-cleaning service operator and custodian as medium work, with the house-cleaning job being unskilled and the custodial position classified as semi-skilled. (AR 48-49.)  She described Plaintiff's jobs as a scanner as light and unskilled.  (AR 49.)  The ALJ then posed the first of three hypothetical questions to her:

> [Assume a person] able to perform light work but requiring a
> sit-stand option and not being required to stand for more
> than an hour maximum at a time with only occasional climbing
> and occasional use of the right lower extremity for
> operating foot controls[.]

(AR 49.)  The vocational expert opined that a person with these limitations could perform Plaintiff's prior work as a scanner, but none of her other jobs.  The ALJ then posed his second hypothetical question:

> [A]ssume a younger individual less than 50 with a high
> school education who has a work history similar to that of
> [Plaintiff] who is limited to light, unskilled work with a
> sit-stand option and only occasional use of the right lower
> extremity for operating foot controls.

(AR 50.)  The expert testified that this second hypothetical person could work as a clerk and light assembler, two positions that existed in significant numbers in the regional economy, even after eroding

5

their numbers to account for the sit-stand option. (AR 50 (leaving 2500 clerk positions and 2400 light assembly positions, respectively, post-erosion).)   Additionally, the expert opined that a person with these limitations could perform the job of sedentary assembler, a position for which there were 10,250 local jobs. (AR 50.)   The ALJ then fine-tuned his second hypothetical question to posit a third:

> [Suppose] this individual needed to take rests during the day, unscheduled breaks, and occasionally leave the work station to go walk around--these would be additional unscheduled breaks--to what extent would an employer tolerate this in an unskilled job?  An hour a day total or two hours a day total.

(AR 50-51.)   The vocational expert opined that this added limitation would eliminate "probably 90 percent of the positions"; *i.e.*, leaving only 250 clerk positions, 240 light assembly positions, and 1025 sedentary assembly positions after this second erosion. (*See* AR 51.) Counsel waived questioning of the expert, and the ALJ adjourned the hearing, leaving the record open so that Plaintiff could provide her most recent medical records and undergo consultative medical examinations with an internal medicine specialist, an orthopedist, and a psychologist. (AR 51-54.)

A careful reading of the reports of these examinations is illuminating.   The orthopedic examination revealed nothing more remarkable than "minimal residual discomfort in [Plaintiff's] ankle." (AR 467.)   That physician noted, however, that Plaintiff "step[ped] off the table as noted with 'her bad ankle' without any apparent difficulty." (AR 467.)   At the internal medicine consultation, Plaintiff admitted that her uterine bleeding had shown "significant

improvement" with monthly Lupron-Depo injections.  (AR 472.)
Otherwise, that examiner found only "a mildly antalgic gait" and
slight range-of-motion limitations in her lower spine and right ankle.
(AR 477.)   Finally, the psychological evaluation was remarkable only
in the sense that Plaintiff's first-impression was inconsistent with
the level of depression and abject poverty she had claimed at the
hearing:

> [Plaintiff] presented in a sullen, mildly hostile manner.
> Throughout the evaluation she was impatient and expressed
> disgust with the process.  She was immaculately dressed with
> proper attention to grooming.  She wore a neat,
> professional, short hair cut.  Make-up was impeccable with
> sculpted eyebrows.  [Her] manicure was well done with long,
> copper fingernails.  Her jewelry consisted of earrings, a
> gold neck chain, a gold bracelet on her left ankle, a thick
> gold watch on her left hand, and a bracelet on her right
> hand.  She also wore a diamond cocktail ring on her right
> hand and a large solitaire diamond on her left hand.

(AR 485.)[3]   After running a full battery of standardized tests, the
examiner found that Plaintiff "does not evidence significant cognitive

---

[3]   Plaintiff's treating physicians described her demeanor in
similar terms.  (*See* AR 442 (noting that Plaintiff was
"indignant" when her doctor was five minutes late, and recording
Plaintiff's statement that "she expects 'professionalism'"); 443
(describing her as displaying a "strong sense of entitlement"); 445
(noting that Plaintiff became "irate using profane language" when,
after missing her appointment, she was asked to reschedule it); 446
(noting that, after listening to Plaintiff yell into the telephone for
three uninterrupted minutes during a call, the clinician hung up: only
to have Plaintiff enter the clinic two minutes later yelling and
"disturbing [. . .] the other clients in the lobby").)

1  or emotional limitations regarding her ability to function in work-

2  related situations." (AR 490.) Notwithstanding Plaintiff's

3  disagreeable nature, this doctor found that she "could choose to

4  relate adequately to authority figures," and concluded that she could

5  "perform simple, repetitive, and more complex skills." (AR 490.)

6      After reviewing the record, which included the results of these

7  three consultative examinations, the ALJ analyzed Plaintiff's claims

8  under the five-step sequential evaluation process on January 30, 2004.

9  (*See* AR 11-19.) At step one, she determined that Plaintiff had not

10  engaged in substantial gainful activity since her alleged onset date.

11  (*See* AR 13.) At steps two and three, the ALJ concluded that

12  Plaintiff's chronic pain from her right ankle injury, her degenerative

13  joint disease in her left knee, and her uterine bleeding with anemia

14  were all "severe" within the meaning of the regulations, but not

15  severe enough to meet or equal a Listing-level impairment.[4] (AR 13.)

16  After summarizing the medical evidence, the ALJ adopted the medical

17  expert's assessment of Plaintiff's residual functional capacity. (AR

18  13-17.) At step four, the ALJ accepted the vocational expert's

19  opinion that a person with Plaintiff's limitations could not return to

20  any of her former work. (*See* AR 17.) At step five, however, the ALJ

21  accepted the vocational expert's testimony in response to the *second*

22  hypothetical question, regarding the type and number of positions that

23  Plaintiff could perform. (AR 18.) On the basis of that testimony,

24

25

26      [4]  Because the record showed that Plaintiff only underwent
treatment for depression for six months--from September 2002 to
27  February 2003--the ALJ determined that this was not a severe
impairment. (AR 16.) Plaintiff does not challenge that finding here.
28  (*See generally* Joint Stip.)

8

1  the ALJ determined that Plaintiff had not rebutted the presumption of
2  continuing non-disability, and, therefore, was not disabled.  (AR 19.)

3      Plaintiff timely sought review of the ALJ's decision.  (AR 6-7.)
4  On May 15, 2004, the Appeals Council denied Plaintiff's Request for
5  Review, and the decision of the ALJ became the final decision of the
6  Agency.  (*See* AR 3-5.)  On July 13, 2004, Plaintiff filed her
7  Complaint in this Court.  On May 16, 2005, the parties filed a Joint
8  Stipulation ("Joint Stip.") setting forth the contested issues.

9                              III.

10                       STANDARD OF REVIEW

11     "Disability" under the applicable statute is defined as the
12  inability to perform any substantial gainful activity because of "any
13  medically determinable physical or mental impairment which can be
14  expected to result in death or which has lasted or can be expected to
15  last for a continuous period of not less than twelve months."  42
16  U.S.C. § 1382c(a)(3)(A).  The Court may overturn the ALJ's decision
17  that a claimant is not disabled only if the decision is not supported
18  by substantial evidence or is based on legal error.  *See Magallanes v.*
19  *Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

20     Substantial evidence "'means such relevant evidence as a
21  reasonable mind might accept as adequate to support a conclusion.'"
22  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison*
23  *Co. v. NLRB*, 305 U.S. 197, 229 (1938).)  It is "more than a mere
24  scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d
25  599, 601 (9th Cir. 1998), and "does not mean a large or considerable
26  amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

27     "The Court must uphold the ALJ's conclusion even if the evidence
28  in the record is susceptible to more than one rational

                                   9

1   interpretation." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595,

2   599 (9th Cir. 1999).  Indeed, if the record evidence reasonably can

3   support either affirming or reversing the Agency's decision, this

4   Court must not substitute its judgment for that of the ALJ.  *See*

5   *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  If the ALJ

6   committed error but the error was harmless, reversal is not required.

7   *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th

8   Cir. 2003)(applying the harmless error standard).

9                                   IV.

10                              DISCUSSION

11       Plaintiff claims that the ALJ erred in two respects.  First, she

12  faults the ALJ for "failing to consider the significant side effects"

13  of her medications.  (Joint Stip. at 3.)  Second, Plaintiff complains

14  that the ALJ compounded her first error by failing to include these

15  side-effects in her hypothetical question to the vocational expert.

16  (*See* Joint Stip. at 6-7.)

17       Each of Plaintiff's substantive arguments implicates the weight

18  that the ALJ gave the medical evidence of her mental impairments.

19  (*See* Joint Stip. at 3, 6-7.)  Plaintiff does not, however, challenge

20  the ALJ's determination that her testimony was less than credible.

21  (*See* Joint Stip. at 3-8; *see also* AR 17.)  That being so, what the ALJ

22  had to say about Plaintiff's credibility is worth quoting at length:

23       In reaching the conclusions regarding [Plaintiff's]

24       condition and functional capacity, the undersigned has also

25       given consideration to [her] subjective complaints and

26       allegations, but the undersigned does not find that

27       [Plaintiff] has provided any information sufficiently

28       credible to warrant the assessment of more restrictive

                                   10

1    limitations.  [Plaintiff's] medical treatment has been
2    routine and conservative.  Treatment records reflect that
3    use of medication has helped to relieve her pain symptoms
4    and has controlled her uterine bleeding with no evidence of
5    any significant side effects that have result[ed] in more
6    than minimal functional limitations.  [Her] daily
7    activities[,] including household chores, light cooking,
8    shopping, and visiting with family and friends reflect a
9    physically active and healthy lifestyle.  Evidence in the
10   record also shows that [Plaintiff] reported she attends
11   church and bible study and her hobbies include crochet,
12   reading, painting, and playing her keyboard.  All the
13   aforementioned factors are inconsistent with an
14   incapacitating or debilitating condition at any time since
15   [her] alleged onset date.  As such, the undersigned cannot
16   find that [Plaintiff's] statements are sufficiently credible
17   to warrant the establishment of more restrictive
18   limitations.

19   (*See* AR 17 (citations to record omitted).)  On this basis, the ALJ

20   concluded that Plaintiff "remains physically capable of performing

21   light work."  (AR 17.)

22       All of the examples the ALJ offered were legally-sufficient

23   reasons to support the conclusion that Plaintiff's testimony was not

24   credible.  Specifically, it is the ALJ's prerogative to evaluate the

25   type of treatment a claimant receives.  *See Johnson v. Shalala*, 60

26   F.3d 1428, 1433-34 (9th Cir. 1995)(upholding ALJ's finding that

27   claimant's subjective testimony of pain was not credible because of

28   the minimal, conservative treatment prescribed for the claimant's

11

condition).  A claimant's daily activities also bear on her

credibility.  *See Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th

Cir. 1997)(noting that the ALJ's rejection of a claimant's credibility

could be based upon various factors, including "inconsistencies either

in his testimony or between his testimony and his conduct," including

his "daily activities").  Finally, the ALJ is entitled to assess the

evidence of side-effects when considering whether to credit her

testimony.  *See Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995)

(noting that "[f]actors that the [ALJ] may consider when making [. .

.] credibility determinations include the [. . .] effectiveness or

adverse side effects of any pain medication").

A review of the record confirms the ALJ's determination that

these considerations cut against Plaintiff's credibility.  The record

shows that Plaintiff's treatment was conservative, consisting of

medication and some counseling.[5]  (*See* AR 158-490.)  Furthermore, the

record supports the ALJ's assessment of Plaintiff's daily activities.[6]

---

[5]  Indeed, the record contains evidence that Plaintiff refused
more aggressive treatment.  For example, during the orthopedic
evaluation, Plaintiff told her examiner that her treating physician
had "wanted to operate on her back but she refused because she did not
want to end up in a 'wheelchair.'" (AR 460-61.)  In Plaintiff's
internal medicine consultation, Plaintiff admitted that she declined
her doctor's recommendation that she have a partial hysterectomy to
resolve her uterine dysfunction.  (AR 472.)  Thus, Plaintiff was not
merely *prescribed* conservative treatment: here she actually eschewed
her doctors' more aggressive recommendations.

[6]  Besides the examples the ALJ noted, Plaintiff's daily
activities cannot be reconciled with her claims of pain-related
concentration deficits.  (*See* AR 37.)  Plaintiff told her treating
physician that her concentration was "fairly good," explaining she
could read one to two chapters of fiction at a sitting and was writing
a book.  (*See* AR 441-42.)  The record contains other, more glaring
inconsistencies as well.  (*Compare* AR 299, 448, 450 (reflecting
Plaintiff's confession to her treating physicians that she had used

1  (*See* AR 144-46, 441.)  Finally (and as will be explained below),

2  substantial evidence supports the ALJ's estimation of Plaintiff's

3  claimed side-effects.  Before considering the ALJ's handling of the

4  medical evidence, then, the Court first must address her finding that

5  Plaintiff was not credible and clarify the implications of Plaintiff's

6  decision not to challenge that finding here.

7      It is axiomatic that "[c]redibility determinations are the

8  province of the ALJ."  *See Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir.

9  1989).  For that fundamental reason, this Court will not second-guess

10 an unchallenged credibility finding.  *See Solomon v. Secretary of*

11 *Health and Human Services*, No. 91-CV-77171 DT, 1992 WL 478586, at *2

12 (E.D. Mich. Aug. 13, 1992)("The Plaintiff has not challenged the ALJ's

13 determination of her credibility, and the Court accepts it as

14 accurate.").  A claimant's failure to dispute the ALJ's finding that

15 her testimony was incredible means that, to the extent that *any* of her

16 arguments rely upon citations to her own testimony or statements in

17 the record, that argument "carries no weight."  *See Stanistreet v.*

18 *Chater*, 21 F.Supp.2d 1129, 1135 n.15 (C.D. Cal. 1995); *accord West v.*

19 *Barnhart*, 254 F.Supp.2d 1216, 1227 (D. Kan. 2003)(holding that, where

20 the "ALJ determined plaintiff's testimony is not credible and

21 plaintiff does not challenge that finding, plaintiff's testimony that

22 her sitting capacity is severely limited is not sufficient to negate

23 the ALJ's [residual functional capacity] finding").

24     Bearing in mind the ALJ's unchallenged adverse credibility

25 determination, each of Plaintiff's specific arguments will be

26 _____

27 cocaine and marijuana in the past) *with* AR 486 (memorializing
   Plaintiff's denial to the consultative psychologist that she had ever
28 used street drugs).)

1  addressed separately.   For the reasons set forth below, the Court

2  finds that the ALJ's ruling was proper, and supported by substantial

3  evidence.

4  A.   The ALJ Properly Rejected Plaintiff's Claimed Pharmaceutical

5       Side-Effects By Way Of The Adverse Credibility Determination

6       At her hearing, Plaintiff testified that her medication caused

7  depression and fatigue; because of her fatigue, she claimed to endure

8  insomnia and memory impairments.   (AR 35-37.)   Although Plaintiff did

9  not testify *which* of her medications she believed caused these side-

10  effects, she now argues that Vicodin was the culprit, and complains

11  that the ALJ went astray by "failing to consider the significant side

12  effects" of this medication.[7]   (*See* Joint Stip. at 3.)   In light of

13  the ALJ's adverse credibility determination, this claim must be

14  rejected.

15      In assessing a claimant's condition, the ALJ must "investigate

16  all avenues presented that relate to subjective complaints, including

17  the claimant's prior work record and information and observations by

18  treating and examining physicians and third parties."   *See* S.S.R. 88-

19  13.   This investigation includes, among other things, an inquiry into

20  the "adverse side effects of any pain medication."   *Id.*

21  Significantly, however, the weight an ALJ gives evidence of

22  pharmacological side-effects will vary, depending upon how credible

23  the claimant is generally.   *See Orteza*, 50 F.3d at 750.   Where the ALJ

24  finds the claimant's testimony is generally not credible and the

25

26      [7]   *See also* AR 131 (containing Plaintiff's allegation of "memory
    loss" from Vicodin in the Disability Report she completed on August 8,
27  2000); AR 147 (Plaintiff's Daily Activities Questionnaire;
    memorializing her claim that her medications caused her "mind to be
28  foggy").)

                                     14

1  record does not otherwise support her claim of adverse side-effects,
2  the Ninth Circuit has held that a general rejection of the claimant's
3  testimony, if properly supported, is broad enough to include the
4  rejection of her side-effect testimony:

5      [The claimant] offers no objective evidence that her
6      medications affected her concentration or caused dizziness.
7      The only evidence regarding these symptoms is [the
8      claimant's] own statements to her doctor and her testimony
9      at the hearing.  While [the claimant's] testimony cannot be
10     rejected solely because the objective medical evidence does
11     not support the severity of her impairment, the ALJ properly
12     rejected her testimony by using "ordinary techniques of
13     credibility evaluation" and providing a specific, clear and
14     convincing reason, supported by the record, that her
15     testimony was generally not credible. *Thomas v. Barnhart*,
16     278 F.3d 947, 960 (9th Cir. 2002).  Thus, where a claimant's
17     assertions of side-effects all come from the claimant
18     herself, the ALJ is not required to accept those claims
19     unless he finds her testimony to be credible.  *See* 20 C.F.R.
20     §§ 404.1529, 416.929.

21     As explained above, the ALJ specifically found that Plaintiff's
22  testimony was not credible, and singled-out her complaint of medicinal
23  side-effects in so finding.  (*See* AR 17.)  The evidence supports this
24  determination.  Contrary to her testimony, and despite the position
25  she has taken in her pleadings, Plaintiff never complained to her
26  doctors that any of her medicines were causing her to be depressed;
27  instead, she told her doctors in 2002 that her depression was "a
28  result of family abuse toward her daughter" and her loss of

15

independence. (*See* AR 441, 447.) And although the record contains several physicians' reports reflecting that Plaintiff was prescribed Vicodin, those reports contain no notation that she ever complained to her doctors of side-effects from that drug. (*See* AR 160, 172-73, 182, 203, 205, 210, 252-53, 266, 273, 350, 353, 384, 388.) Periodically, Plaintiff told her doctors that she was "fatigued": but both she and they attributed that symptom to a flare-up of anemia, or to transitory bouts of bronchitis or pneumonia--rather than to any pharmaceutical side-effects--even though she was taking Vicodin at the time of some of those complaints.[8] (*See* AR 298, 303-04, 353, 384, 420.) Finally, Plaintiff did not complain of insomnia or memory impairment to her doctors; instead, a psychological examination revealed that Plaintiff's memory of immediate, daily, and remote events was all intact. (*See* AR 488.)

Other than Plaintiff's testimony at the hearing and in her assertions in Agency filings, the entire record contains only *one* mention of side-effects: her complaint in May 1999 (*i.e.*, before the alleged onset of her disability) that her "medication has me moving kinda slow." (*See* AR 259.) The timing of that complaint is telling, because it predates June 1999: the earliest record of Plaintiff taking Vicodin. (*See* AR 210.) Even if Plaintiff had been taking Vicodin

---

[8] It is important to note that Plaintiff's treating physicians regarded her dysfunctional uterine bleeding and her poor iron intake as the joint causes of her anemia. (AR 300, 388.) Plaintiff's doctors controlled her dysfunctional bleeding with monthly injections and, to prevent flare-ups of anemic episodes, gave Plaintiff iron supplements. (*See* AR 363, 385, 472.) Thus, a fair reading of the record suggests that Plaintiff's fatigue was not a side-effect at all, but a symptom of an underlying impairment that has since been treated successfully with other medication.

16

1    earlier, it is noteworthy that she continued to work *despite* feeling

2    fatigued.  (*See* AR 31 (containing Plaintiff's testimony that she

3    worked until injuring her foot in February 2000).)  Where a claimant

4    continues to work despite her claimed side-effects, the ALJ may

5    conclude that those side-effects are non-disabling.  *See Soria v.*

6    *Callahan*, 16 F.Supp.2d 1145, 1154 (C.D. Cal. 1997).

7        This state of the evidence offers substantial support to the

8    ALJ's handling of Plaintiff's side-effect testimony.  Where, as here,

9    the medical evidence is devoid of any mention of significant side

10   effects, the ALJ is required to reject testimony to that effect.  *See*

11   *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985)(requiring

12   clinical evidence to support claims of impairment from drug side

13   effects); *see also Osenbrock v. Apfel*, 240 F.3d 1157, 1164 (9th Cir.

14   2001)(finding no substantial evidence of claimant's impairment from

15   medicinal side effects where the record contained "passing mentions of

16   the side effects of [the claimant's] medication in some of the medical

17   records, but there was no evidence of side effects severe enough to

18   interfere with [the claimant's] ability to work").

19       In sum, the ALJ's rejection of Plaintiff's testimony about

20   pharmaceutical side-effects was subsumed within his rejection of her

21   testimony generally.  The ALJ specifically pointed out that there was

22   no other evidence that Plaintiff suffered side-effects (AR 17), and

23   this finding is supported by substantial evidence.  In these

24   circumstances, and because the record does not support Plaintiff's

25   claims of side-effects, remand is unnecessary to address side effects

26

27

28

17

1   that were only minimally alleged by Plaintiff alone.  *See Orcutt v.*
2   *Barnhart*, No. ED CV-04-889-PLA, 2005 WL 2387702, at *7 (C.D. Cal.
3   Sept. 27, 2005).

4   B.   The ALJ Was Not Required To Include Side-Effect-Related
5        Limitations In Her Questions To The Vocational Expert

6        Plaintiff complains that the hypothetical questions the ALJ posed
7   to the vocational expert were incomplete.  (Joint Stip. at 6-7.)
8   Specifically, Plaintiff laments that the ALJ's hypothetical questions
9   "failed to consider or include limitations from the side effects
10  caused by Plaintiff's medications, to which she credibly testified[.]"
11  (Joint Stip. at 6.)  Because Plaintiff has not challenged the ALJ's
12  finding that her subjective symptom testimony--including her testimony
13  about side-effects--was not credible, and because the record contains
14  no other evidence that Plaintiff suffered such side-effects, the Court
15  concludes that the ALJ was not required to incorporate side-effect-
16  related limitations into his questions to the vocational expert.

17       "In order for the testimony of a [vocational expert] to be
18  considered reliable, the hypothetical posed must include all of the
19  claimant's functional limitations, both physical and mental[,]
20  supported by the record."  *Thomas*, 278 F.3d at 956 (citation and
21  internal quotation marks omitted).  However, "[t]he ALJ is not bound
22  to accept as true the restrictions presented in a hypothetical
23  question propounded by a claimant's counsel.  Rather, the ALJ is free
24  to accept or reject these restrictions ... as long as they are
25  supported by substantial evidence."  *Magallanes*, 881 F.2d at 756-57
26  (citation and internal quotation marks omitted).  Thus, the ALJ need
27  not include *all* claimed impairments in hypothetical questions if she
28

18

explains her rationale for disbelieving any of the claimant's subjective complaints not included in the hypothetical. *See Copeland v. Bowen*, 861 F.2d 536, 540 (9th Cir. 1988).

Here, the questions the ALJ posed to the vocational expert *did* account for all of Plaintiff's claimed limitations for which substantial evidence existed. (*See* AR 49-51.)  As explained at length above, the ALJ made specific findings explaining why she disbelieved that Plaintiff's prescribed medications caused side-effects warranting further limitations. (*See* AR 17.)  Again, Plaintiff has not challenged this credibility determination, and substantial evidence supports it. (*See* Joint Stip. at 3, 6-7.)  Where, as here, the evidence does not support a claimant's assertion of side-effects, the ALJ properly omits mention of them from his hypothetical question.[9] *See Osenbrock*, 240 F.3d at 1164; *see also Calsadillas v. Apfel*, 1 F.Supp.2d 1044, 1049 (C.D. Cal. 1998).  Accordingly, the ALJ was not required to include Plaintiff's claimed side-effects in any of the hypothetical questions she posed to the vocational expert.

In sum, the Court concludes that the hypothetical questions the ALJ posed to the vocational expert adequately captured all of Plaintiff's functional limitations that were supported by the record. *Thomas*, 278 F.3d at 956.  This being so, the Court rejects Plaintiff's contention that remand for another hearing is necessary.

---

[9]   Insofar as the lone mention of side-effects in the medical record predated the alleged onset of Plaintiff's disability (*see* AR 259), the ALJ was not required to include this limitation in his hypothetical questions. *See Blom v. Barnhart*, 363 F.Supp.2d 1041, 1057 and n.19 (E.D. Wis. 2005).

19

V.

CONCLUSION

For the reasons set forth above, this Court finds that the Agency's findings are supported by substantial evidence and are free from material legal error.   Therefore, the Court affirms the decision of the Agency and enters summary judgment in favor of the Agency and against Plaintiff.

IT IS SO ORDERED.


DATED:      November   _28_  , 2005.

                                        /s/
                              _____
                              PATRICK J. WALSH
                              UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Soc Sec\MCNEAL, D 824\Memo Opinion.wpd